UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————

| | | |
|---|---|---|
| ALBERT E. DUNN, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | No. 5:14-cv-01625 |
| | : | |
| READING HUMAN RELATIONS | : | |
| COMMISSION, | : | |
| | : | |
| - and - | : | |
| | : | |
| CITY OF READING, PENNSYLVANIA, | : | |
| | : | |
| Defendants. | : | |

———————————————————————

**M E M O R A N D U M**
Defendants' Motion for Summary Judgment – Granted

**Joseph F. Leeson, Jr.**                                              **April 17, 2015**
**United States District Judge**


I.      <u>**Introduction**</u>

        Defendants have moved for summary judgment in their favor on Plaintiff Albert E.

Dunn's claim of unlawful discharge in violation of 42 U.S.C. § 2000e-2(a)(1) ECF No. 22.

Plaintiff alleges Defendants terminated his employment because of his status as an African-

American male.  After a review of the record, the Court determines that there is no genuine

dispute as to any material fact and the Defendants are entitled to judgment as a matter of law.

Accordingly, the Court grants Defendants' Motion for Summary Judgment.

II.     <u>**Factual Background and Procedural History**</u>

In February 2007, Plaintiff was hired by the Reading Human Relations Commission ("HRC") as an investigator. Investigators at the HRC investigate claims of employment and housing discrimination in conjunction with the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Equal Employment Opportunity Commission ("EEOC"). <u>See</u> Defs.' Statement Material, Uncontested Facts Ex. B 14:9-15:3, ECF No. 23-2 [hereinafter "Talbot Dep."]. Plaintiff was one of two investigators at the HRC; the other, Larry Moore, who is white, was hired in January 2002. Talbot Dep. 23:23; <u>See</u> Defs.' Statement Material, Uncontested Facts Ex. A ¶ 12, ECF No. 23-1 [hereinafter "Talbot Aff."]. Throughout nearly all of Plaintiff's tenure with the HRC, Plaintiff and Mr. Moore were supervised by Kimberly Talbot, who was named the executive director of the HRC in November 2007. Talbot Aff. ¶¶ 1-2; Talbot Dep. 6:18. Plaintiff's employment with the HRC ended on December 31, 2011 when he was terminated. Defs.' Statement Material, Uncontested Facts Ex. D, ECF No. 23-5. Plaintiff's Complaint was filed on March 19, 2014 after exhausting his claim before the EEOC.

Defendants assert Plaintiff was terminated as a result of multiple reductions in the HRC's level of funding, which required the HRC to eliminate one of the two investigator positions. <u>See</u> Talbot Aff. ¶¶ 4-10, 13; Talbot Dep. 26:16, 76:17-77:12. Defendants claim that they elected to retain Mr. Moore in lieu of Plaintiff because Plaintiff's tenure with the HRC was shorter than Mr. Moore's and because of problems Defendants identified with Plaintiff's "employment and actions." Talbot Dep. 30:4-7, 31:16-17. During his time at the HRC, Plaintiff was allegedly "rude and disrespectful," raised his voice with Ms. Talbot, refused to follow her directives,

"kick[ed] a file cabinet," and "thr[ew] a picture up against the wall."[1] Talbot Dep. 32:3-7. Ms. Talbot also identified problems with Plaintiff's written work, including his failure to perform tasks correctly or to "follow the examples that were provided" despite being "taught many times and given many examples." Talbot Dep. 32:19-35:19.[2] Plaintiff received one official reprimand from Ms. Talbot, which was recorded in his employment file. Talbot Dep. 32:19-20.

Plaintiff contests Defendants' explanation for his termination. Citing to a HUD document that Defendants produced containing guidance on HUD funding levels for fiscal year 2011, Plaintiff challenges Defendants' assertion that reductions in funding required Defendants to eliminate an investigator position. See Pl.'s Statement of Disputed Facts Ex. B, ECF No. 28-2. Plaintiff further says that Defendants' explanation for his termination is a mere pretext for a decision that was motivated by his race and gender. In support, Plaintiff makes reference to comments that Ms. Talbot allegedly made during his employment with the HRC, which, according to Plaintiff, demonstrate she held animus toward African-American males. Specifically, Plaintiff testified that, in 2010, after Ms. Talbot observed him having a conversation with a Hispanic female, Ms. Talbot said, "you need to stop. You know, you keep messing with them yellow women, you're going to get in trouble."[3] Pl. Dep. 81:3-84:11.  Plaintiff further testified that Ms. Talbot instructed him to use the word "Caucasian" instead of "white" on written work that Plaintiff prepared. Pl. Dep. 9:23-10:7.

---

[1]     Plaintiff does not appear to contest that these latter two incidents occurred, and Plaintiff acknowledges that a discussion occurred regarding the tone of his voice. See Defs.' Statement Material, Uncontested Facts Ex. C 212:5-12, ECF Nos. 23-3, 4 [hereinafter "Pl. Dep."].

[2]     Plaintiff acknowledges that Ms. Talbot identified issues with his written work. Pl. Dep. 185:2-5 ("Kim came in and then all of a sudden my writing was not, it's not good enough, it doesn't meet the standards, doesn't meet the level of excellence.").

[3]     Plaintiff alternatively recalled Ms. Talbot's statement as "you keep talking to the light-skinned girl, that's going to get you in trouble." See Pl. Dep. 9:11-14. Ms. Talbot denied that she made the statement in either form. Talbot Dep. 52:9-13.

Plaintiff also testified to two instances when Ms. Talbot proclaimed her dislike for two African-American men in the community. Plaintiff recalled that, in 2008 or 2009, at an event in the City of Reading called "City Day," Ms. Talbot caught a glimpse of Vaughn Spencer, a then-City Councilman, and stated that she "can't stand him." Pl. Dep. 61:5-11, 63:3, 63:21-22. Similarly, Plaintiff asserts that, also in 2008 or 2009, Ms. Talbot said that she "couldn't stand" Earl Lucas, an African-American man who worked for a magazine called "Afro-Latino" and periodically visited the HRC office to solicit the magazine. Pl. Dep. 64:2-65:17, 68:11-13.[4]

Plaintiff claims that he was not the only person who sensed Ms. Talbot's animus. Plaintiff offers the deposition testimony of Samuel Sims, an African American who visited the HRC several times to file discrimination claims. Mr. Sims stated that, under Ms. Talbot's predecessor, "if you came in [to the HRC] you were attended to. . . . And then being a person of color you wouldn't wait long, no matter who was there." Pl.'s Mem. Supp. Pl.'s Opp'n Mot. Summ. J. Ex. D 25:13-17, ECF No. 28-5 [hereinafter "Sims Dep."]. When asked to compare those earlier experiences with the treatment he received at the HRC after Ms. Talbot became the executive director, Mr. Sims stated, "I wasn't treated at all by Ms. Talbot, so I can't say anything about how she treated me. I know she was busy." Sims Dep. 37:6-16. He confirmed, by contrast, that Ms. Talbot's predecessor used to attend to him personally. Sims Dep. 37:17-20.

In addition to offering the testimony of Mr. Sims, Plaintiff referenced a conversation he had with Gus Giddens, the former chairperson of the Commission of the HRC. See Pl. Dep. 80:12-15; Talbot Dep. 54:2-9. Plaintiff said that Mr. Giddens and Ms. Talbot did not get along, and that in 2010—approximately when Mr. Giddens left the Commission—Mr. Giddens told

---

[4]    Ms. Talbot remembered making a statement with respect to Mr. Spencer, but disagreed with Plaintiff's recollection of the content of her statement. According to Ms. Talbot, she stated, "she couldn't stand the fact that Vaughn was the only person that voted against my brother's appointment." Talbot Dep. 52:22-53:10. Ms. Talbot denied making the statement about Mr. Lucas. Talbot Dep. 53:24.

Plaintiff that Ms. Talbot "had a problem with black men" and that Ms. Talbot was afraid of Plaintiff. Pl. Dep. 70:11-12, 71:10-12, 20-21, 80:15. Plaintiff reported having a similar conversation with Charles Williams, who had filed a complaint with the HRC and "felt that [Ms. Talbot] didn't do her job." Pl. Dep. 74:16-21. He contacted Plaintiff after learning of this action from local media coverage and told Plaintiff he was willing to testify on Plaintiff's behalf, allegedly stating that "he felt that [Ms. Talbot] doesn't like black men . . . she has something against black men."[5] Pl. Dep. 74:16-75:17.

Plaintiff also observes that he was the only African-American male under Ms. Talbot's supervision, which Plaintiff cites as evidence of her bias. Talbot Dep. 56:12-57:6.

In addition to the conduct of Ms. Talbot, Plaintiff also asserted that Sandra Hummel, a human resources employee with the City of Reading, would "make fun" of Plaintiff's mannerisms and "tell people [Plaintiff] murdered somebody." See Pl.'s Mem. Supp. Pl.'s Opp. Mot. Summ. J. Ex. C 52:10-21, ECF No. 28-4.

Plaintiff also states that he possessed superior job qualifications to Mr. Moore, who was white, but that Defendants chose to retain Mr. Moore. Plaintiff focuses on the fact that he received a certification from HUD after he attended a five-week training session and passed a test, Talbot Dep. 78:16-22, 81:16-18, while Mr. Moore only attended one week of the training session and did not receive a certification, Talbot Dep. 8:7-9:4, 81:7-13, 81:19-23.  Plaintiff also asserts that Mr. Moore missed more time from work than Plaintiff due to Mr. Moore's health problems, Talbot Dep. 37:18-38:13, 39:8-18, and that Mr. Moore's health conditions impacted his ability to travel, which is a job requirement, see Talbot Dep. 21:9-11, 85:12-15. Plaintiff also points out that Ms. Talbot observed Mr. Moore reading the newspaper while at work and

---

[5]     Plaintiff does not cite to Mr. Williams's alleged statement in opposition to Defendants' present Motion, but given that Defendants raise that evidence in their present Motion, this Court will consider this evidence along with the other record evidence cited by the parties. See Fed. R. Civ. P. 56(c)(3).

sometimes "nodding" in his office as if he lacked sleep. Talbot Dep. 73:5-7, 73:20-75:15. Plaintiff also observes that he holds a Bachelor of Arts degree, while Ms. Talbot could not recall whether Mr. Moore held a college degree. Talbot Dep. 22:16-23.

In addition, Plaintiff alleges that Defendants knew of Mr. Moore's impending retirement at the time Plaintiff was terminated—Mr. Moore left the HRC in June 2012, approximately six months after Plaintiff's termination—but nonetheless chose to retain Mr. Moore. See Pl.'s Mem. Supp. Pl.'s Opp. Mot. Summ. J. 7-8, ECF No. 28-1 [hereinafter "Pl.'s Mem."]; Talbot Dep. 26:5.

All of the above, according to Plaintiff, gives rise to an inference that he was terminated for improper reasons.

### III.   Legal Standard – Motion for Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id. When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**IV.**     **Analysis of Plaintiff's Claim of Unlawful Discharge**

To establish a claim of employment discrimination under Title VII of the Civil Rights Act of 1964 based on alleged wrongful discharge, a plaintiff must establish by a preponderance of the evidence that plaintiff is a member of a protected class, was qualified for the position, and was terminated "under circumstances that give rise to an inference of unlawful discrimination." See Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995) (quoting Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). If the plaintiff is able to do so, the defendant must then "rebut the presumption of discrimination by producing evidence" of a "legitimate, nondiscriminatory reason" for plaintiff's termination that raises a "genuine issue of fact as to whether it discriminated against the plaintiff." See Burdine, 450 U.S. at 254; id. Once accomplished, "the presumption of discrimination created by the establishment of the prima facie case is dispelled," and the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reason is a mere pretext for a wrongful termination. See Waldron, 56 F.3d at 494; see also Burdine, 450 U.S. at 253, 256. Pretext may be proven either by producing evidence allowing the factfinder to conclude that the employer's proffered reason was a fabrication or by producing evidence allowing the factfinder to infer that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Atkinson v. Lafayette Coll., 460 F.3d 447, 454 (3d Cir. 2006). While the burden of production may shift from one party to the other, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253 (citations omitted).

Plaintiff challenges Defendants' purportedly legitimate reasons for his termination on both grounds, and the Court will analyze each.[6]

## A.     Defendants' Reasons for Plaintiff's Termination

> To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, and not whether the employer is shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)).

Defendants cite reductions in funding as having led to the elimination of the investigator position in order to reduce expenses. Funding for the HRC comes from HUD, EEOC, and the City of Reading. See Talbot Aff. ¶¶ 6, 8-10; Talbot Dep. 41:3-6. Ms. Talbot stated that the level of funding from HUD fell by more than $107,000 from 2008 to 2011, Talbot Aff. ¶ 6, while the level of funding from the EEOC fell by approximately $20,450 from 2009 to 2012, id.[7] With regard to funding from the City, Talbot said it "went down a little bit." Talbot Dep. 47:2-3.

Plaintiff denies this.  He asserts that the HRC did not experience reductions in funding. In support, Plaintiff points only to a HUD document that discusses certain components of HUD's funding for Fair Housing Assistance Program "Contributions Agencies." See Pl.'s Statement of Disputed Facts ¶¶ 22-23 & Ex. B. According to Plaintiff, this document shows that HUD funding

---

[6]     For the purpose of this Motion, Defendants do not contest that Plaintiff has presented a prima facie claim under Title VII, and Plaintiff does not contest that Defendants have proffered a legitimate, non-discriminatory reason for his termination. See Mem. Supp. Mot. Summ. J. 5, ECF No. 22 [hereinafter "Defs.' Mem."]; Pl.'s Mem. 4.

[7]     In her deposition testimony, Ms. Talbot characterized the trend in federal funding for the HRC over this period of time as having "went way down." Talbot Dep. 44:5. Ms. Talbot's knowledge of the levels of funding the HRC received from various sources stems from having written the budget for the HRC in her role as executive director. See Talbot Dep. 40:24, 43:6.

for agencies such as the HRC increased but that "[a]t minimum, the agencies' funding levels were to remain the same." Id. ¶¶ 22-23.

The HUD document relates only to funding from HUD. Plaintiff points to no evidence to dispute Defendants' claims that funding from the EEOC and the City of Reading declined.  The HUD document only purports to discuss HUD's funding levels for one year: fiscal year 2011. Plaintiff has cited no evidence to rebut Defendants' position that HUD funding decreased in 2009 and 2010.[8] The HUD document does not support Plaintiff's position.

The document discusses changes to certain components of HUD funding, such as an "increase from $500 to $1,000 for the additional funds available for complaints where a [Fair Housing Assistance Program] agency issues a charge of discrimination or cause determination" and an "increase in administrative costs for [Fair Housing Assistance Program] agencies that process more than 11 complaints." Importantly, it does not address the total level of funding each agency was to receive from HUD during the period. Rather, the document explains that agencies like the HRC receive funding from HUD "based on activities conducted within a preceding twelve-month period." The document is therefore similar to a rate card, setting forth the amount of funds HUD planned to provide per each "activity conducted" by agencies such as HRC.[9] Even

---

[8]    Moreover, it is questionable whether this document even relates to funding the HRC would have received from HUD in 2011. The document states that funding for agencies like the HRC is calculated "based on activities conducted within a preceding twelve-month period (the performance period)," which "provide[s] HUD staff sufficient time to execute or amend cooperative agreements, review complaints, and calculate payments." The performance period applicable to the funding levels discussed in this document spans from July 1, 2010 to June 30, 2011 for "complaint processing," and from October 1, 2010 to September 30, 2011 for "training", "administrative costs", and "partnership." The document suggests that, after the completion of these periods, HUD would then proceed to calculate the level of funding due to each agency based on the agency's level of activity during those periods. Thus, it appears that funding for "fiscal year 2011" was likely not calculated and disseminated to agencies like the HRC until the latter half of 2011 at the earliest. If so, even if this document indicates that HUD funding for the HRC was not due to decline for "fiscal year 2011," it would not controvert Defendants' assertion that HUD funding declined from 2008 to 2011. Plaintiff has produced no evidence to show when the HRC received the funding discussed in this document.

[9]    For example, the document states that "[i]n FY2010, complaints processed by [Fair Housing Assistance Program] agencies that are cognizable under the Fair Housing Act may be reimbursed up to $2,600 per complaint."

if the document shows that HUD's "rates" increased in 2011, this alone would not impact on whether the total funding HRC received from HUD increased, decreased, or remained the same. That determination would depend upon the nature and volume of activities conducted by the HRC, which would then be multiplied by HUD's "rates," and Plaintiff produces no evidence from which that calculation could be made. Further confounding that calculation is that the document indicates many of these funding components are discretionary, which would further prevent the factfinder from drawing conclusions about the level of funding HRC received based on this document standing alone.[10] Plaintiff points to no other evidence to controvert Defendants' position that HRC experienced a loss of funding resulting in Plaintiff's termination. The HUD document would not permit a reasonable jury to conclude that Defendants fabricated their explanation of the job elimination.

Plaintiff complaints of Defendants' decision to terminate him instead of Mr. Moore. Defendants claim that they chose to retain Mr. Moore based on his seniority to Plaintiff and issues with Plaintiff's work. In response, Plaintiff claims that Defendants' explanation has two inconsistencies and Defendants fabricated these justifications to hide their discriminatory bias.

First, Plaintiff claims that Ms. Talbot's testimony, in which she describes the reasons Defendants retained Mr. Moore over Plaintiff, is inconsistent. At her deposition, Ms. Talbot was asked if HRC terminated Plaintiff solely because he had lesser tenure than Mr. Moore, to which Ms. Talbot responded, "Yes." Talbot Dep. 31:7-9. When she was asked immediately after

---

The document also discusses levels of funding for "administrative costs" and "training," but these components of HUD funding would not be relevant to the HRC's ability to retain Plaintiff, since these funds are earmarked for specific purposes. See Talbot Dep. 44:21-45:7 (stating that salaries were "not allowed" to be paid from administrative costs, which could only be used for "computer upgrades, a laptop, copier expense, that type of thing").

[10]        For example, the document provides that complaints may be reimbursed "up to $2,600 per complaint" and "HUD [Government Technical Representatives] have the discretion to reimburse 100% (i.e., $2,600) if a complaint resulted in a conciliation agreement that included relief that is both significant and appropriate in light of the issues raised by the complainant."

whether Defendants considered any other factors other than tenure, she responded, "[i]nitially, yes," before proceeding to discuss issues that Defendants identified with Plaintiff's job performance. Talbot Dep. 31:10-13. According to Plaintiff, "Defendants' own statements, therefore, create a dispute of fact." Pl.'s Statement of Disputed Facts ¶ 31.[11]

The Court, however, does not see inconsistencies in Talbot's testimony that would permit the factfinder to infer that Defendants have fabricated reasons for terminating Plaintiff. Immediately prior to the colloquy Plaintiff cites, Talbot was asked to explain how Defendants reached the decision to terminate Plaintiff. She said that Defendants discussed the "tenure of each employee and realized that Al Dunn was the last person hired that was still with the HRC." Talbot Dep. 29:22-30:7. She was then asked whether Defendants considered any other criteria, to which she replied, "Yes. Yes." Talbot Dep. 30:16-20. When asked to clarify whether she meant, "[y]es, there were other considerations," she again replied, "Yes." Talbot Dep. 30:21-22. Talbot then proceeded to discuss at length the issues that Defendants identified with Plaintiff's job performance. Talbot Dep. 31:18-36:4. Although "ever-changing" reasons for an adverse employment action can call the legitimacy of an employer's action into question, such as where "a plaintiff demonstrates that the reasons given for [his] termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings," any purported inconsistencies "should be considered in light of the entire record." See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 284 (3d Cir. 2001). Defendants have maintained that the termination decision was based on Plaintiff's tenure and his job performance, and the Court does not see how the factfinder could reasonably infer otherwise from the entirety of Ms. Talbot's testimony.

---

[11]      While Plaintiff raised this line of argument as part of his response to Defendants' Statement of Material, Uncontested Facts, ECF No. 23, Plaintiff did not discuss his argument in his response to Defendant's Motion for Summary Judgment. This Court will consider the argument notwithstanding Plaintiff's apparent abandonment of it.

Second, Plaintiff argues that, at the time Defendants elected to retain Mr. Moore, Defendants knew that Mr. Moore "was, at the very least, seriously considering retirement in the near future." According to Plaintiff, Defendants' decision to retain Mr. Moore, who did in fact retire six months later, casts doubt on Defendants' decision to terminate Plaintiff. See Pl.'s Mem. 7-8. To support his claim, Plaintiff refers to a HUD "Performance Assessment Report" of the HRC from 2009, which states that "Investigator Larry Moore will be retiring." See Pl.'s Mem. Ex. B, at 3. Plaintiff claims that this document shows that Defendants knew of Mr. Moore's impending retirement, rendering Defendants' decision to terminate him implausible.

The report however, was prepared approximately three years prior to Mr. Moore's retirement. Ms. Talbot testified that, while Mr. Moore had intended to retire in 2009, "he got ill and needed to remain employed due to the health insurance. So then he stopped discussing retirement." Talbot Dep. 24:15-25:13. Plaintiff points to no other evidence to support his claim that Defendants knew Mr. Moore "was, at the very least, seriously considering retirement in the near future" or to suggest that, in December 2011, Defendants were aware of Mr. Moore's retirement plans with any specificity. The Court, does not see how the factfinder could infer from this evidence that Defendants' explanation for terminating Plaintiff is implausible.[12]

---

[12]     Plaintiff claims that statements Ms. Talbot made later in her deposition testimony "create a genuine dispute as to a material fact as to whether HRC was aware of Mr. Moore's intentions to retire." Pl.'s Mem. 8. When asked if the 2009 Performance Assessment Report indicated that the HRC "took it fairly seriously" that Mr. Moore intended to retire, Ms. Talbot responded, "Not necessarily." Talbot Dep. 82:15-83:4. She went on to explain that while Mr. Moore had expressed his intent to retire at the time the Report was prepared, she personally did not believe that he would in fact retire. She further testified that the HRC believed that he "potentially" would be retiring, and that reference to his retirement was included on the Performance Assessment Report only for the purpose of explaining why Mr. Moore had attended only part of a HUD training program. Talbot Dep. 83:15-84:18. While the evidence may suggest a dispute over the extent to which, in 2009, Ms. Talbot or others at the HRC subjectively believed that Mr. Moore intended to retire, these facts are not relevant to Plaintiff's claim that Defendants knew at the time they elected to terminate Plaintiff that Mr. Moore's retirement was imminent. Put differently, to the extent the evidence establishes that a genuine dispute exists over these facts, these facts are not material to Plaintiff's claim.

**B.**      **Analysis of Plaintiff's Claim that His Job Termination was Improperly Motivated**

The evidence Plaintiff cites to support his contention that his termination was improperly motivated takes one of three forms: statements Ms. Talbot allegedly made during Plaintiff's employment with the HRC, observations by third parties of Ms. Talbot's animus toward African-American males, and other references of animus unrelated to Ms. Talbot. The Court reviews the evidence Plaintiff cites in that order.

Plaintiff identifies four statements Talbot allegedly made that, to Plaintiff, raise the inference that his status as an African-American male motivated Defendants' to terminate him: (i) in 2010, after observing Plaintiff speaking with a Hispanic female, the statement, "you need to stop. You know, you keep messing with them yellow women, you're going to get in trouble," (ii) an instruction to Plaintiff to use the word "Caucasian" instead of "white" in Plaintiff's written work product, (iii) in 2008 or 2009, after catching a glimpse of Mr. Spencer, the African-American City Councilman, the statement "I can't stand him," and (iv) in 2008 or 2009, with regard to Mr. Lucas, the African-American who worked for a magazine, the statement, "I can't stand him."

The probative value of a remark that is alleged to demonstrate the presence of discriminatory animus varies depending upon the identity of the speaker and the temporal and topical relationship between the remark and the adverse employment action. See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.") (citations omitted). Viewed in this light, the remarks Talbot made provide little probative evidence of any discriminatory animus in the decision-making process. First, while the statement, "you need to

13

stop. You know, you keep messing with them yellow women, you're going to get in trouble," contains the most overt racial content of any of the statements, she allegedly made the statement over one year prior to Plaintiff's termination, and the statement has no topical relationship to Plaintiff's termination. Second, while the evidence cited by the parties does not reveal when Talbot instructed Plaintiff to substitute the word "Caucasian" for the word "white" in his work product, this statement also bears no relation to his termination. This statement has only a tenuous connection to any expression of racial bias, and Plaintiff has presented no evidence to show any connection.

Finally, with regard to the two similar statements of "I can't stand him" that Ms. Talbot allegedly uttered in reference to two African-American men in the community, these statements are race and gender neutral. See Brewer v. Bd. Of Trs. of Univ. of Ill., 479 F.3d 908, 916 (7th Cir. 2007) (observing that it would be "pure speculation" to conclude that a remark that an employee's poor performance had "ruined it for everyone else" referred to the employee's race). When Talbot was confronted with her statement that she "can't stand" Mr. Spencer, she testified that she "couldn't stand the fact that [Mr. Spencer] was the only person that voted against [her] brother's appointment," and Plaintiff introduced no evidence to contradict Ms. Talbot's explanation. Talbot Dep. 53:4-10. These two statements, each made over two years prior to Plaintiff's termination, have no relation to his termination or to Plaintiff.

While "proof of a discriminatory atmosphere may be relevant in proving pretext since such evidence 'does tend to add "color" to the employer's decisionmaking process,'" these four statements, over a four-year period, are insufficient for a reasonable factfinder to conclude that there was a discriminatory atmosphere at HRC. See Ezold, 983 F.2d at 546 (quoting Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987)).

14

Plaintiff references others' impressions of Ms. Talbot for support. Plaintiff points to the deposition testimony of Mr. Sims and the statements of Mr. Giddens and Mr. Williams, in which each expressed their beliefs that Ms. Talbot had discriminatory animus. Mr. Sims testified to receiving less attentive service at the HRC after Ms. Talbot assumed the role of executive director, stating that, compared to her predecessor, he "wasn't treated at all by Ms. Talbot, so I can't say anything about how she treated me. I know she was busy." With regard to Mr. Giddens and Mr. Williams, Plaintiff claimed in his deposition testimony that Mr. Giddens, the former chairperson of the Commission of the HRC, stated that Ms. Talbot "had a problem with black men" and was afraid of Plaintiff. Similarly, Plaintiff testified that Mr. Williams, in his dealings with Ms. Talbot at the HRC, "felt that [Ms. Talbot] doesn't like black men . . . she has something against black men."[13]

These statements contain only the conclusory beliefs of Mr. Sims, Mr. Giddens, and Mr. Williams of Ms. Talbot's animus, and Plaintiff has not made a showing that they have any foundation. The only explanation Plaintiff offers for Mr. Giddens's statement is that Ms. Talbot and Mr. Giddens "didn't get along" during Mr. Giddens's time as a commissioner of the HRC. Plaintiff claims"[t]hey went back and forth, back and forth, back and forth. They had problems." See Pl. Dep. 70:10-12, 71:2-4. With regard to Mr. Sims and Mr. Williams, their allegations appear to be based solely on their respective beliefs that Talbot did not provide them with satisfactory service during their dealings with the HRC, because they were African-American males. A mere subjective belief that a person possesses the intent to discriminate,

---

[13]     Defendant objects to Plaintiff's reliance on these alleged statements of Mr. Giddens and Mr. Williams as inadmissible hearsay, but in the context of a motion for summary judgment, the question is not whether the evidence offered is admissible in the form it is presented but whether that evidence "cannot be presented in a form that would be admissible at trial." See Fed. R. Civ. P. 56(c)(2). Accordingly, even if each statement may constitute hearsay in its present form, "in this circuit it can be considered on a motion for summary judgment because it is capable of being admissible at trial." See Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993) (observing that, at trial, "[plaintiff] simply has to produce the [speaker to whom the statement is attributed] to give this testimony").

unsubstantiated by any indication that animus is at work, does not create an inference of discrimination. See Yue Yu v. McGrath, No. 14-1842, 2014 WL 7384328, at *4 (3d Cir. Dec. 30, 2014); Kier v. F. Lackland & Sons, LLC, No. 14-897, 2014 WL 7192403 (E.D. Pa. Dec. 17, 2014) (recognizing that a "mere subjective belief that . . . comments were discriminatory, without any objective foundation on which to rest that belief, is insufficient to establish racial animus"). A plaintiff may not rely solely upon the plaintiff's own unsubstantiated beliefs of discriminatory intent to withstand summary judgment, nor may Plaintiff rely on evidentiary support from unsubstantiated beliefs of others.

The probative value of these statements, and the statements of Ms. Talbot are diminished by the fact that the decision to terminate did not rest solely in Ms. Talbot's hands. Talbot testified that the decision to terminate Plaintiff was not made by her alone; the City of Reading human resources department (including its managing director) and the City's accounting/administrative department were also involved in the decision-making process.[14] See Talbot Dep. 76:7-77:12; see also Talbot Dep. 29:22-30:7 ("We discussed . . . [t]he tenure of each employee and realized that [Plaintiff] was the last person hired that was still with the HRC.") (emphasis added). Since others contributed to the decision-making process this diffuses any impact of Talbot's alleged bias on Defendants' decision to terminate Plaintiff. See Rozskowiak v. Vill. Of Arlington Heights, 415 F.3d 608, 613 (7th Cir. 2005); Weightman v. Bank of N.Y. Mellon Corp., 772 F. Supp. 2d 693, 711 (W.D. Pa. 2011).

---

[14] Plaintiff disagrees, asserting that Ms. Talbot "may have had the de facto ability to fire employees." Pl.'s Statement of Disputed Facts ¶ 6. The only evidence Plaintiff offers in support of this contention is the deposition testimony of Christine Wheelan, the City of Reading Human Resources Director, in which she states that "I did find out a lot of times a lot of things went on in the managing director's office that did not include me and I should have been included." This testimony appears to be probative of an inter-office conflict at the Human Resources Department (Ms. Talbot testified that the managing director of the Human Resources Department was involved in the decision to terminate Plaintiff and she did not mention Ms. Wheelan) but does not bear on the question of who was involved in the decision to terminate Plaintiff, other than to suggest that Ms. Wheelan may not have been among them.

The evidence Plaintiff offers that is unrelated to Ms. Talbot is scant. Plaintiff produced evidence that Sandra Hummel, a human resources employee for the City of Reading, would "make fun" of Plaintiff's mannerisms and "tell people [Plaintiff] murdered somebody." But Plaintiff does not claim that Ms. Hummel was involved in the decision to terminate his employment.  He offers no evidence to show Ms. Hummel's conduct was racially motivated.[15]

Plaintiff also observes that he was the only African-American male employed at the HRC during the term of his employment, but there were only between four and six people employed at the HRC over that period—a sample size far too small from which to draw any meaningful inferences of improper bias. See Waris v. HCR Manor Care, No. 07-3344, 2009 WL 330990, at *17 (E.D. Pa. Feb. 10, 2009) ("Plaintiff's sample size of three Director or Administrator positions is simply too small to imply any sort of discriminatory practice by Defendant.").

Plaintiff says he was more qualified than Mr. Moore for an investigator position at HRC, and that the decision to retain Mr. Moore in the face of his superior qualifications provides evidence of pretext. "Qualifications evidence may suffice, at least in some circumstances, to show pretext." Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (per curiam).  Plaintiff's purportedly superior qualifications can only give rise to an inference of discrimination if those qualifications relate to the criteria Defendants applied in their decision-making process. "In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action. The employee's positive performance in another category is not relevant . . . ." See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) (citations omitted); see also Ezold, 983

---

[15]   Ms. Hummel's alleged comment that Plaintiff "murdered" someone appears to be in reference to Plaintiff's past conviction for involuntary manslaughter. See Pl. Dep. 45:22-46:8.

F.2d at 528 ("[A] district court should focus on the qualification the employer found lacking in determining whether non-members of the protected class were treated more favorably.").

Plaintiff emphasizes that he attended a full regimen of HUD-mandated training courses and received a certification from HUD upon his successful completion of an examination, while Mr. Moore only attended part of the training courses and did not hold that certification. But the criteria Defendants evaluated in their assessment of Plaintiff and Mr. Moore were the two employees' respective tenure and performance issues; only if Plaintiff possessed superior qualifications to Mr. Moore in those categories could an inference of discrimination arise. That Plaintiff may have been more qualified than Mr. Moore based on other criteria is generally not probative of discriminatory intent. See Simpson, 142 F.3d at 647. Plaintiff may consider Defendants unwise for focusing on tenure and problems with job performance rather than on Plaintiff and Mr. Moore's relative qualifications, but "the employee's judgment as to the importance of the stated criteri[a]" is not relevant to the determination of whether an employer's decision was improper, and it is not for this Court to "subjectively weigh factors it considers important." See id.; Ezold, 983 F.2d at 528 (reprimanding a district court for evaluating an employee's "other skills and attributes" rather than the employer's chosen criteria).[16]

---

[16] Conceivably, a significant disparity between Plaintiff's and Mr. Moore's credentials could be relevant for a different reason: not to show that Defendants applied their chosen criteria in a biased manner, but to show that Defendants fabricated these criteria. If Plaintiff possessed obviously superior job-related credentials but Defendants claimed they did not consider those credentials as part of their decision-making process, such evidence may tend to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." See Keller, 130 F.3d at 1108-09 (quoting Fuentes, 32 F.3d at 765). For example, in Brewer v. Quaker State Oil Refining Corporation, 72 F.3d 326 (3d Cir. 1995), the court found that the district court erred in discounting evidence of a terminated salesperson's superior sales volume even though the employer claimed that the salesperson was fired solely because of "organizational deficiencies," in light of the employer's admission that sales performance was "the most important standard of job performance." 72 F.3d at 331-33. The court observed that three months prior to his termination, the salesperson "was the only sales representative in the Detroit region" to receive a sales bonus, and the court concluded that a "factfinder could find it implausible" that his employer would have terminated him for organizational deficiencies "when he was so successful" in an area of performance of such admitted importance to his employer. Id. at 331-32.

Turning to the criteria Defendants chose, the law is that an inference of discrimination does not arise merely because this Court might believe Defendants reached the wrong conclusion. See Ezold, 983 F.2d at 533. A wrong decision "would be unfair, but that is not for [this Court] to judge." Id. Rather, there must be a disparity in Plaintiff's and Mr. Moore's qualifications significant enough to indicate that "the standards were 'manifestly unequally applied.'" See id. (quoting Villanueva v. Wellesley Coll., 930 F.2d 124, 131 (1st Cir. 1991)); see also Ash, 546 U.S. at 457-58 (surveying the standards applied by various circuits to qualifications evidence). The evidence Plaintiff cites establishes that Mr. Moore, not Plaintiff, was the more qualified employee under Defendants' criteria. Plaintiff does not dispute that Mr. Moore was the longer-tenured of the two, and Plaintiff generally does not contest Ms. Talbot's description of the issues she identified with Plaintiff's work, such as the failure to perform tasks

---

But Brewer this case is not. Here, Plaintiff's evidence demonstrates no such disparity in credentials to allow an inference that Defendants' claim to have only considered matters of tenure and performance issues is a fabrication. In support of his claim to superior credentials, Plaintiff relies primarily on his HUD certification and Mr. Moore's lack thereof, which Plaintiff alleges was "required" for the investigator position. See Pl.'s Mem. 4-5. But as Plaintiff recognizes, the evidence indicates that sending employees for training was "HUD-required," not HRC-required. The "requirement" to participate in HUD training programs is imposed by federal regulations as a condition to the local agency receiving additional funding earmarked specifically for training, see 24 C.F.R. § 115.306 (2014), and Ms. Talbot testified that neither participating in HUD training programs nor obtaining a HUD certification was a job requirement. See Talbot Dep. 64:17-65:19. Plaintiff also fails to reconcile Mr. Moore's apparent ability to retain his position at the HRC for a number of years despite lacking this certification with Plaintiff's claim that this certification was a job requirement.

Plaintiff also points to his possession of a college degree, while Ms. Talbot could not recall whether Mr. Moore held the same. Defendants observe, however, that the HRC accepted relevant experience in lieu of a college degree. See Talbot Dep. 22:7-15. Ms. Talbot testified that Mr. Moore had previously worked for the Pennsylvania Human Rights Commission, "had an extensive background in investigations," and, at the HRC, he "practically wrote the program for the EEOC as an investigator," while Plaintiff did not have any prior investigation experience. Talbot Dep. 22:24-23:20, 66:9-22.

Even if this Court inferred that possessing a HUD certification was required of investigators at the HRC, a factfinder could not reasonably conclude that the disparity between Plaintiff's and Mr. Moore's credentials—if Plaintiff's were in fact superior overall—was substantial enough to show that it was implausible for Defendants not to take Plaintiff's credentials into consideration. The disparity in credentials must be significant to support an inference that Defendants claim to have not considered them was an attempt to conceal discrimination, for this Court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments." See Millbrook v. IBP, Inc., 280 F.3d 1169, 1181 (7th Cir. 2002) (citations and internal quotations omitted)); Brewer, 72 F.3d at 332 (quoting McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992)).

correctly, the failure to follow examples provided to him, and that he was formally disciplined.[17] Plaintiff instead points to issues with Mr. Moore's job performance – Mr. Moore missing substantial time due to health issues and Ms. Talbot's observations of Mr. Moore reading the newspaper while at work and sometimes "nodding" in his office as if he lacked sleep. Drawing all inferences in Plaintiff's favor, the evidence Plaintiff cites does not show that he was more qualified than Mr. Moore under these criteria. The evidence Plaintiff cites would not permit the factfinder to determine that Defendants' criteria were "manifestly unequally applied."

## V.   Conclusion

The question is whether Plaintiff has sufficient evidence from which a jury could conclude that Plaintiff has shown, by a preponderance of the evidence, that Defendants' explanation for his termination was a mere pretext to hide discriminatory animus. The Court is concerned not with the number of allegations Plaintiff asserts, but with the evidence Plaintiff has to support his allegations. See Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) ("[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings." (internal citations omitted)) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The Court determines that a reasonable jury could not conclude that Defendants' decision was motivated by Plaintiff's status as an African-American male.  Summary judgment is therefore entered in favor of all Defendants and against the Plaintiff.  An Order consistent with this determination follows.

---

[17]    Plaintiff acknowledges that while he received an official reprimand during his employment with the HRC, Mr. Moore did not. See Pl.'s Mem. 5. Plaintiff believes this fact cuts in his favor, arguing that "a reasonable finder of fact could call into question Ms. Talbot's discretion in handing out disciplinary measures." See Pl.'s Mem. 6. Plaintiff, however, has not produced any evidence of the HRC's disciplinary policies or practices from which the factfinder could conclude that Ms. Talbot handed down discipline in an unequal manner or any other evidence to suggest that Plaintiff was subjected to a different standard than Mr. Moore.

**BY THE COURT:**


*/s/ Joseph F. Leeson, Jr.*
**JOSEPH F. LEESON, JR., U.S.D.J.**